Kinsey C. J.
The state of this case now before us for our decision is as r 11 lOllOWS — -»
By an act of the legislature of November 30th ±792. the sheriff of the county of Middlesex is directed to advertise an , * election, for fixing on a place where the Gaol and Court-house f°r the county shall be erected; and gives liberty to all t« propose the place where these buildings shall be located.
In the second section of the act it is declared that the election shall be by ballot, and shall be conducted in the manner, and under the regulations and penalties prescribed for the election of members of the assembly; and it is added, that the sheriff, and at least three of the inspectors, shall certify, under their hands and seals, to the board of Justices and Freeholders, the place for which the greatest number of votes shall be given, and that shall be the place where the buildings shall be erected. It proceeds to authorize the assessors and collectors to raise a sum of money for these purposes, as well as to purchase a suitable lot for the buildings, and declares them to be the Court-house and Gaol of the county.
These proceedings have been brought before this court by a certiorari, issued on the application and complaint of some *245 of the Inhabitants of---from which it appears that the majority of votes in favour of New Brunstvick amounted to one hundred and twenty-two.
In November 1793. an application was made for a rule of court for taking depositions, and under this rule a number of affidavits have been taken and laid before us, viz. those of Ebenezer Ford and Matthias Halstead two of the judges of the election, of John M Halstead one of the clerks, and of three other persons stating and confirming the same facts. From this testimony the following facts fully appear—
1st The inspectors or some of them objected to some of the voters, and demanded that they should be put to the test required by the act of Assembly. Instead however of this, the bare declaration of the voter was received as conclusive evidence of his being qualified; and one of the inspectors says that he was openly insulted for making the request. This fact appears from the depositions of several of the witnesses.
2d A negro man was admitted to vote, who had no legal residence; and his declaration that he had been manumitted in an other state, was received as sufficient proof of his being entitled to a vote.
3d There is strong and cogent proof leading to the persuasion that during the election, the box in which the tickets were deposited, was broken open, from certain marks of violence not upon it when the election commenced, and which appeared before its conclusion.
ith The electors were publickly addressed in favour of New Brunswick; and in order to induce them to fix upon that place as the seite, they were told that £1000 would be advanced by that town towards defraying the expense of the buildings, provided they were to be erected there.
These are some, though by no means the whole of the facts.? which appear in these affidavits.
Notice was given on the part of the applicants for the Certiorari, of the taking of these depositions: no person however appeared on behalf of Brunswick to cross examine the witnesses; — and what in my opinion is even more remarkable, no counter affidavits have been produced, to disprove any of the facts set forth in those taken on the part of the prosecu *246 tion; some of which contain serious charges, alleging facts which strike at the first principles of good government, as well as at the freedom of election.
Two counsel have appeared in support of the Certiorari who have argued the cause, and have moved to vacate the certificates on the grounds set forth in the affidavits.
Mr. Leake of counsel for Nexv Brunswick has appeared, and informed the court that he did not on this occasion design to hold any argument with regard to the certiorari]— that the Board of Justices and Freeholders did not conceive that this court had any jurisdiction of the matter in question^ and that since the election in 1793 the prosecutors had ample opportunity to apply to the Legislature for the redress which that body alone, was competent to afford them.
As the defendants and others inculpated, therefore, have declined to argue the question of jurisdiction, and have made no attempt to disprove any of the facts set forth in the affidavits, these facts must be taken as fully proved.
Thus the matter stands at present before us. I own that I should have been better pleased if an application had been made to the Legislature, who if they thought the matter required it, might have applied a more complete remedy than it is in the power of this court to afford. This course, however, has not been pursued. Application is made to us for redress, and we should be unworthy of holding these seats, were we to shrink from performing a duty imposed upon us, and from giving our opinion upon a question of so much importance in its immediate and remote results to the community at large.
It is scarcely necessary to premise, that as judges and individuals, we disclaim any kind of interference in the question where these buildings shall be erected. If the county has had an election conducted in the manner prescribed by law, it is our duty and it is our wish to support it. If, however this court has a right to inquire into the question whether there was a legal election, or whether the law was prostituted and trodden down to subserve the interests, or to gratify the passions of faction; and it shall appear that the election ■has not been conformable to the design and intention of the *247 Legislature, who had no other in view that» a fair one, as free :iud as fair an election as that under which they sit as the representatives of the people of the state, then it is a duty imposed upon us by the situations we hold, and which we owe to the pubiick, to express our sentiments fully and openly, and to enforce our opinion, as far as the powers reposed in us will permit, whether it is to affect an individual, a county, oribe state in general.
The jurisdiction of this court has been indirectly questioned by the Justices and Freeholders, and therefore it becomes necessary to inquire in tlmjirsl place, whether we have any right to examine into the matters brought before us and to adjudicate upon them: — and if this question be decided in the affirmative, then whether the facts proved afford, a suffi. cient ground for our interference.
The first question has been argued by the counsel without any very elaborate preparation. Cases however have been cited from 1 Salk. 146. 1 Bac. Abr. 561, 2. (Wilson’s Edit.) 4 Vin. Abr. “Certiorari.” 329, 336. sec. 19, 20, 21. and Fttzgib. 245. to show the general powers of the court to interfere in all cases, where either an individual, or a collection of persons have sustained any injury. Indeed as the object tion was altogether a novel one, and as the practice in this court, ever since I knew any thing of it, has been to exercise a jurisdiction in all cases of this kind; and to give a remedy for injustice whether committed under pretence of law or without any such pretext, few cases were necessary to be referred to. If the defendants however had not declined taking any part in the discussion, I should have been pleased to hear what was to be said in support of a position which to me won: so new an aspect. A second argument has not however been requested, and having given to this subject as much consideration as our limited time and other avocations would permit; and entertaining no doubt ourselves upon the subject, there is no reason to postpone giving our judgment» The question as to the jurisdiction may be considered in two points of view, 1st as it is affected by the acknowledged principles of law, and cases that have been decided. 2d On the reason of the thing. As to the first — *
*248 Lord Coke speaking of the jurisdiction of the Court of King’s Bench, in whose place we stand, says, that before the ^me Edavard I. the Chief Justice was created by letters patent, the form of one which he gives — ■ “ The King to the ‘t archbishops, bishops, barons &c. See.' — Whereas for our (i own safety, and to preserve the tranquillity of our kingdom “ at large, and to do and execute justice to all and each of “ our subjects, we have appointed our trusty and well beloved “ A. B. Chief Justice of England.” He remarks that this officer was created for three purposes. 1st The safety of the king; — 2d the tranquillity of the realm; — 3d to do justice to every body. This was the original jurisdiction of the court. Indeed no government can be properly carried on, unless a power resides somewhere to afford justice to every individual; protection of the people is the basis upon which all government is founded.
Coke in the following page observes that this officer is now created by writ, which however “ comprehends the sub- “ stance of the former letters patent, and includes all that was “ intended to be granted to him by them.”
If this be law, and I believe it has never been questioned, the power of this court to give redress is as unlimited and universal as' injustice and wrong can be. Unless therefore the Board of Justices &?c. can show that they form an exception to this rule; — that whether they do, or do not execute the powers delegated to them by the legislature, in the mode prescribed by the act of assembly;--that if instead of executing these delegated powers for the general good of the community, they should prostitute them to subserve the interests of a party; — still they are not amenable to any legal tribunal, as all other persons invested with powers are, it is the duty of this court to review their proceedings, so far as to see that justice is done, and to vacate them if they have swerved from the legal line of their duty or employed their authority for the purposes of oppression.
Toa man in any degree versed in the law, much, need not be said to show the reason why the Court of King’s Bench exercised this unlimited authority. The king is the fountain from which all justice flows, the subjects are entitled to *249 t’n£ projection of all their rights; and while they are thus protected, and no longer, do they owe allegiance to him. These duties are reciprocal. In former times he was accustomed to :-.it in that court, and to administer justice; — and to every purpose of jurisdiction, he is still supposed to be present: hence to say the court docs not possess jurisdiction, comm ensurate with the injury that may he inflicted, shows great ignorance of the law and the constitution.
Lord Coke is not more full and comprehensive in his language than Bracton, nor is either of them more so than the statute of 20 Edw Sd, — by which it is enacted that “the Jus- “ tices shall do even law and execution to all our subjects ie rich and poor, without having regard to any person, and “ without omitting to do right for any letters &e. or by any (i other cause.”
Another principle of the law is entitled to considerable weight in settling this question. It is a rule that when you plead to the jurisdiction of the court, you must point out in your plea another court which has jurisdiction, and the reason is obvious;' — the subject has a right to protection and redress somewhere. I never have heard it directly contended that injuries may be committed beyond the jurisdiction of every tribunal. If therefore this court has not cognizance of this cause, it was incumbent on the defendants to show where the injury complained of may be redressed; for to assert that a person injured is without redress in any court, is to say what never did exist under our constitution or the common law. Freeman 99.1 Mod. 44. 8 Mod. 331. 10 Mod. 48. 4 Inst, 71. In this last book the language is particularly comprehensive “ This court hath not only jurisdiction to correct er~ “ rors in judicial proceedings, but other errors and misdeM meanors extrajudicial, tending to the breach of the peace e< or oppression of the subjects, or raising of faction, contro- ** versy, debate', or any other manner of misgovernment; so “ that no wrong or injury, either publick or private, can be a done, but that this shall be reformed or punished in one cí «ourt or other by due course of law,*’* — and in the saw; *250 words does Lord Coke express the resolution of the court in. Bang’s case, (a)
Hawkms a writer of considerable eminence and authority, seems as ignorant of this limitation of the powers of die ' court as Lord, Coke. Speaking of the powers of the King’s Bench, he says “ It is certain that this court T? intrusted with “ the highest jurisdiction, not only over all'- capital offences, “ but also all other misdemeanors whatever of a publick 11a- “ ture, tending either to a breach of the peace, or oppression “ of the subject &c. so that whatever crime is manifestly 44 against the publick good, it comes within the conusance of “ this court, though it do not directly injure any particular 44 person; neither can any private person, who has not forfeit- “ ed his right to the protection of the lav/, suffer any kind of ‘‘ unlawful violence or gross injustice against his person, “ liberty or possessions, from any person whatever, without (i a proper remedy from this court.” — Neither is it necesiC sary in a prosecution for any such offence in this court, to 44 show a precedent of the like crime formerly punished here, 44 agreeing with the present in all its circumstances; for this 44 court being the castos morum of all the subjects of the realm, 44 wherever it meets with an offence, contrary to the first 44 principles of common justices, and of dangerous conse44 quence to the publick if not restrained, it will adapt such. “ punishment to it, as is suitable to the heinousness of it.” 2 Hawk. 8. B. 2. c. 3. sec. 3, 4.
One mode of exercising this power is by way of Certiorari to bring the proceedings before the court. But the court are to exercise a discretion in allowing them, and not to suffer them to be issued for vexatious purposes, The King v. Jenkinson, (b) and that discretion is sometimes exercised before an injury actually accrues to any one, by issuing a mandamus as in the case of The Queen v. Commissioners of the land tax (c) where the court granted a mandamus to tax the lands equally. So in the case of The King v. Commissioners of the land tax (d) a mandamus issued to the Commis *251 '..loticia to elect a clerk. In The King v. Mayor &c. of York a mandamus issued requiring the Mayor to put the corporate seal to the certificate of an election. In the case of The King Barker and others (a) it issued to the trustees of a meeting-house to admit a dissenting teacher to the use of the pulpit, In this case Lord Biansfield observed “ Here is a funcíS tion, with legal emoluments; and no specifick legal remedy. <e The right depends upon election, which interests all the u voters. Should the court deny this remedy the congregation may be tempted to resist violence by force. In this case the defendants refuse to go to a new election, or try “ the election already made in a feigned issue. To deny this *'• writ would be to put them out of the protection of the law* 44 The case is entitled to protection and it can be had only by (i granting this writ.”
In The King v. King and others (b) the court quashed a Certiorari issued for the removal of all the assessments of the land tax in a particular district for the year 1787, on the ground of publick inconvenience; hut so far from questioning the power and authority of the court to review these proceedings by Certiorari, Ashhurst J. in his opinion expressly says “ if we quash the Certiorari on the grounds of publick inconvenience, we must take care at the same time, that the a party who applied for it shall not suffer any inconvenience li by quashing it.”
These cases in my opinion fully show the jurisdiction of this court and preclude the necessity for many additional observations, however it may not be amiss to subjoin the following—
1st The jurisdiction of this court is original, and has subsisted beyond the memory of man. It is general and universal; — criminally, to punish every breach of good order, and of the peace of society; — civilly, to give a remedy and a compensation for every injury. — It is restricted by no rule to particular evils, and until the contrary is proved, it has a right to vacate any act committed under colour of a law, directly *252 contrary to that law; and more especially when this act tends to oppression, and to deprive the inhabitants of the free exercise of their elective franchise.
2d Where the injury is extensive, and involves any considerable portion of the community, it is better to take up the business in gross and to vacate the proceedings, than to put every individual to the necessity of working out his own re - dress by a separate suit.
3d The right to grant a mandamus to an officer, commanding him to lay an equal tax, or to perform his duty when he has neglected it, shows that this court has the right to superintend the proceedings of officers appointed to execute particular laws, and to judge whether they have complied with the requisitions of the law.
Mh The acts of Parliament mentioned in some of the cases that have been referred to, contain no words giving the court jurisdiction, or subjecting the officers to their control. What they did was under the ancient and original jurisdiction of the court, and in execution of a power which must be vested in some tribunal, in order that the people may be protected in their just rights.
5th The court exercises a jurisdiction over the elections of officers chosen under an act of Parliament, in publick corporations, and even in the case of private trusts. The reason is the same; — the power is necessary for the preservation of the peace of the community; — and with what colour can it be pretended that this court, whose duty it emphatically is to take care that justice is done to every one, has no power to protect the interests, and redress the wrongs of an entire county.
6th If such a power is not lodged in this court, the citizen as Lord Mansjield said “ is put out of the protection of the law.” .
7th That the rights of electors, and that elections should be conducted fairly, are points upon which we cannot be too jealous. Whenever these rights are invaded, whenever a law intended to effectuate one purpose is perverted from its design, either by fraud or illegal practices, and made to sub-serve illegal and private purposes; or wherever allegations of *253 dib: nature are substantiated by evidence, diere is no man uni! no body of men elevated so high in society, as tó be ex» empt from the jurisdiction and supervision of some court.
The basis on which this power is exercised is a solid one; because necessary to the peace of the community, and without which the main design of government, to wit, protection, cannot be allowed. This interference however is itself limited and controled by the laws of the land, subjected to a revision in the last resort by the governor and council, and it cannot do injury.
To say that the Legislature may apply a remedy is no answer at all, or a very indifferent one. It is subversive of all liberty to unite in one body the legislative and executive functions; or to permit that those who create the law, should assume the powers of a court of justice, and determine questions of any kind, which ought to be, and constitutionally may be settled by judicial tribunals. It is their province to make the laws, but they have no right or power to enforce their execution; and there is no ground upon which they can claim cognizance of this cause which would not equally apply to any other cause whatever.
As to the second question, whether the facts proved afford sufficient grounds for our interference in the present case I observe—
1st The act of November 1792, declares that the election shall be conducted in all respects in the manner, and under the same regulations as the election for members of the Assembly.
By the act of 1783, the giving, or offering, or promising any fee, reward, &c. or any undue influence to prevail on persons to vote is prohibited and a penalty of £B0 imposed on the offender. This act did not introduce any new law; It did no more than what the common law had done long before, and no more than what common sense tells us is essential to all elections in a good government, — that they should jbe freely and fairly had, as the only means of giving publick satisfaction and effecting the publick convenience. Every deviation is an encroachment on the rights of the people, and an invasion of that good order which is essential to the peace *254 of the country, and it behoves the court to interpose, and- t'o prevent all attempts of this kind.
ff the facts stated in the affidavits before us are ¡consistent with truth, and there is no ground for questioning it, what opinion must be entertained of the election now complained of?
By the 8th Section, if a vote is objected tqgjt shall not be received, until the person who offers it takes the oath of allegiance, and if required, that he is worth £50, and has resided within the county one year. The provision is a good and highly reasonable one; — it is calculated to keep the right of election in the hands of those who have property at stake, and who have resided in the county long enough to enable them to acquire a knowledge of the characters of the candidates between whom they are to choose. According to the affidavits the inspectors took no notice of objections made by one of their own body; and the only effect it produced was to subject the proposer of it to insult. The bare word of one man that he was qualified, — the affirmation of a blackmail that he had been manumitted, were held sufficient to entitle these persons to vote for the place where the Court-house and gaol were to be erected. Again, can there be a doubt from the evidence but that the box in which the tickets were deposited, was clandestinely broken open during the time of the election? For what purpose and with what view were the voters addressed, and told that Brunswick had appropriated, or would appropriate £1000 to defray the expenses of these buildings? Was not this to induce persons to vote for that place? Is there any difference between giving money for a vote, and undertaking to pay a tax for a person who is legally liable, and must be burthened with it? Is there any difference between giving a voter a sum of money, and the securing him from the payment of it? — Is an election of this nature, conducted, in the words and spirit of the act; — in all respects, and under the regulations prescribed for the election of the representatives in the legislature? — I trust no man who has the real interests of the state in view, can wish that an election carried on in this manner should stand.
We are therefore of opinion that these proceedings are properly inquirable into by this court, and that we have the *255 ¿lower, and are called upon to declare them void if not carried on under, and pursuant to the directions of the act of Assembly. In expressing this opinion we hold the same langauge which was held by the Legislature in November t7'SB, relative to an election of members of Assembly, in which they say that an election illegally conducted is void.
JVote. —The following endorsement appears on the opinion of the Chief Justice and in his hand-writing. “ Jan. 7,1795 on error before Governor and Council this judgment was reversed 8 to 3, I have heard the ground of this reversal was that the Suprema Court had no jurisdiction.” sed quere!
If this be so, all acts founded on this illegal election must likewise be void, and the assessments &c. are of no validity. No one can be legally compelled to pay them, and if this court on a Certiorari in each case would be compellable to say so, it is far better that the proceedings should be vacated, in tolo at once, to prevent much unnecessary expense and trouble.' — We are therefore unanimously of opinion that the election is illegal and void, and must be quashed.

 li Rep. 98.

 1 T. R. 82.

 11 Mod. 206. Note. See however Butler v. Cobbet. Ib. 254.

 1 T.ll. 146. .

 3 Burr. 1265.

 2 T. R. 234. Note See also 2 T. R. 290, 337. The King v. Bishop of Ely.